WILKIE *et al. v.* WEST CONST. CO. OF TENNESSEE, INC., *et al.*

(In Banc. Jan. 10, 1944. Suggestion of Error Overruled Feb. 14, 1944.)

[16 So. (2d) 154. No. 35506.]

Stone & Stone, of Coffeeville, for appellants.

W. J. Evans and Paul M. Moore, both of Calhoun City, for appellants.

E. M. Livingston, of Louisville, and Patterson & Patterson, of Calhoun City, for appellees.

Argued orally by **W. I. Stone**, for appellant, and by **E. M. Livingston**, for appellee.

**Anderson, J.**, delivered the opinion of the court.

Appellee, the West Construction Company, a foreign corporation, was employed by the State Highway Commission to construct a paved east and west highway between the towns of Vardaman and Greysport. Howard Wilkie, one of its employes, on the 19th of November, 1941, was struck and killed by a lumber truck belonging to W. L. Plunk, and driven by Howard Talant. The ap-

pellants, Wilkie's wife and daughter, brought a foreign attachment in chancery against the West Company, its superintendent and other employes, to recover damages for his death. A trial was had on bill, answers and proofs, resulting in a decree against Plunk and Talant in the sum of $20,000, and dismissing the bill as to the West Company, its superintendent and other employes. From that decree the wife and daughter alone prosecute this appeal.

The following facts were amply supported by the evidence, and the greater part thereof were found to exist, by the chancellor in his finding of facts, which finding was made a part of the record.

The West Company had completed the highway except the sodding of the shoulders and placing what is known as ''grouted rip-rap'' at the bridges along the highway. This work consisted of rocks properly placed along the banks of the streams, and bound together with cement.

The State Highway Commission ordered the West Company to open the highway for traffic, which was done, and that the sodding and rip-rap work be continued and completed thereafter.

Wilkie lost his life at the bridge across Red Grass Creek, which is 120 feet long. East of that bridge about 180 feet is another creek and bridge. The width of both of these bridges is 24 feet, and the width of the pavement between them is the same. For a mile or more east and west of the Red Grass Creek bridge the road is straight. Shorty Darter was the West Company's foreman in charge of the ''rip-rap work'' under the Red Grass Creek bridge. He and his crew went to work on the day of the tragedy, carrying their tools and implements necessary for that purpose in a truck, which they parked without lights on the north side of the highway near the east end of the bridge, with the south wheels occupying only a foot and a half of the paved part of the highway, leaving open to traffic the south 22½ feet of the pavement. The shoulders on each side were approximately four feet wide,

therefore the paved and unpaved parts of the highway together were about 32 feet wide. In doing the work it was necessary to go back and forth at times to this tool truck. It could not have been parked conveniently else-where.

In order to do this work it was necessary to use several loads of rock. Wilkie was employed by the West Company to haul and deliver this rock near to the east end of the bridge, and there to dump it down the embankment to the ground below. For this purpose he was furnished a truck and three negro men to assist him. He got the rock east of the bridge, and delivered the first load about eleven o'clock on the day of his death. The road embankment through Red Creek valley, including that at the east end of the bridge, was high. Wilkie's truck was about 14 feet long. He came with a fourth load, and, following his custom, which was a necessary one, he parked his truck as near the south edge of the shoulder on the south side as he could safely do, for the purpose of dumping the rock down the embankment. This left his truck facing north, and therefore at right angles with the highway. It took only one to four minutes to empty the truck. There was an attachment which was used to dump the contents of the truck instantly.

After the truck had been placed, the evidence was conflicting as to the space left between its front and the Darter truck on the north. As stated, the Darter truck only occupied 18 inches of the pavement, and the Wilkie truck was 14 feet long. The evidence varied as to what the space was between the two trucks—it ranges from 6½ to 11½ feet. The evidence made it doubtful as to whether it was dark, dusk or daylight—as stated, it was around 5 P. M. on November 19th. There was ample evidence to show that it was light enough to see a good, long distance east and west over the highway.

Before Wilkie could dump the rock he saw a truck coming from the west, driven by Talant. It was carrying a heavy load of lumber, and running at a high rate of

speed. Wilkie was evidently of opinion that in this emergency the thing for him to do was to run up on the bridge and flag the truck down, which he did—and was killed by the truck in doing so.

The West Company had furnished flares, which were on his truck, with which to signal traffic. He had not put them out before parking across the highway, and there was no evidence to show that he intended to do so after he stopped, and failed for want of time. There was evidence that the lumber truck struck both the Wilkie truck and the Darter truck, but that if the latter had not been there, it would nevertheless have struck the Wilkie truck, which, as shown, was on the right-hand side of the driver of the lumber truck. If Wilkie had put out his flares, as he was required to do, in all probability Talant would have stopped before reaching the east end of the bridge. In other words, Wilkie adopted a highly unsafe method in trying to stop the lumber truck, instead of the safe way provided by his employer. His own unwise and unauthorized act, and Talant's negligence were the sole proximate causes of his death. The Dartner truck did not contribute to it—it would have occurred if the Darter truck had not been there.

The liability of the West Company was sought to be established on the ground that Wilkie was not furnished a reasonably safe place to work, and a safe and suitable means to work with. It is true, the rule is that it is the non-delegable duty of the master to use reasonable care to furnish the servant with a reasonably safe place to work, and suitable instrumentalities with which to work. But there is a recognized exception to this rule; and that is, the master is not liable where the place or instrumentality becomes or remains unsafe because of a breach of duty on the part of the injured servant. Hegwood v. J. J. Newman Lbr. Co., 132 Miss. 487, 96 So. 695; Bruce Co. v. Brogan, 175 Miss. 208, 166 So. 350; Waterman-Fouke Lbr. Co. v. Miles, 135 Miss. 146, 99 So. 759.

It was Wilkie's duty to make his place to work safe, and he had the means at hand to do so, but failed to avail himself thereof.

If this case had been-tried in the circuit court, would the appellants have been entitled to a directed verdict on the issue of liability? Clearly not. If not, the decree of the chancellor must stand. This court cannot substitute its judgment for that of the chancellor on issues of fact. Affirmed.

## DISSENTING OPINION.

**McGehee, J.**, delivered a dissenting opinion.

Even though it be conceded that Talant, the driver of the lumber truck which struck and killed Wilkie, was negligent in not having his truck under such control as to avoid the accident, and that Wilkie was guilty of negligence that contributed to his being struck and killed by the lumber truck at a time when he was attempting in an emergency to flag it and avert the impending collision between the said oncoming lumber truck and the two trucks of the defendant West Construction Company which had blocked the highway to such an extent as to prevent the lumber truck from passing with safety, it is also true in my opinion that the Construction Company was likewise negligent under the undisputed facts of this case.

Both Talant and his companion on the lumber truck testified that except for the fact that the pick-up truck was parked at the end of the bridge and partly on the paved highway along an embankment, where it had been left by the foreman Darter without its lights burning and while it was drizzling rain and foggy, and dark enough to require the use of lights by the lumber truck and the other truck of the Construction Company referred to as the Wilkie truck, they would have been able to have passed without striking the Wilkie truck. These two occupants of the lumber truck were the only eye-witnesses

to the collision, and they are corroborated by the physical facts in saying that there was not sufficient space between the pick-up truck and the Wilkie truck for the lumber truck to pass without striking one or both of these trucks with the lumber truck, the latter being eight feet in width and having collided with the other two trucks at the same instant and in such manner as to strike the fender of the pick-up truck and badly damage the Wilkie truck from the left front wheel forward, the said Wilkie truck being parked crossways on the pavement at right angles with the pick-up, as required to be done by the Construction Company to enable its employee Wilkie to unload the rock by dumping the same down the embankment. And, most assuredly, it was inexcusable negligence for the construction foreman Darter to have left his pick-up at the place in question when he necessarily knew that presently it would become the duty of Wilkie to place his rock truck, fourteen feet in length, at right angles therewith in order to unload the same, and for him to then leave it there where it served to create a veritable deathtrap against which Wilkie was making a desperate effort to warn the approaching lumber truck when he lost his life.

But it said that Wilkie should have put out flares. However, since the occupants of the lumber truck, as found by the chancellor, saw the lights of the Wilkie truck before it ever parked across the highway and while it was approaching the scene from the direction in which the lumber truck was traveling, it would appear that the failure of the latter to stop in time to avoid the collision was due to the fact that the Construction Company foreman, as driver of the pick-up truck, had not put on his lights or otherwise given timely warning of its presence at the scene and of its location with reference to the Wilkie truck. It would further appear that Wilkie was only required to make known the presence of his truck, the lights of which the driver of the lumber truck saw in due time to have slowed down; and that therefore the

failure of Wilkie to put out flares for the protection of his truck was not the proximate cause of the accident.

And if it be said that Wilkie's death was due to his going onto the bridge to flag the lumber truck, the answer is that the act of Darter in leaving his pick-up truck where it was created the necessity for Wilkie doing so and he was complying with the doctrine of "the last clear chance" in trying to save the lives perhaps of the occupants of the oncoming truck in the impending crisis, a duty that he owed under the law on behalf of his employer.

Moreover, Darter could have parked the pick-up truck in a similar position at any place on the embankment within a distance of 3,000 yards from the bridge in either direction, and so that it would not have been directly opposite where he knew the rock trucks would presently be required to park at right angles therewith. The Construction Company should have promulgated a rule that would have so required it in the interest of the safety of the rock haulers, and should have seen to it that the rule was carried out. Albert v. Doullut & Ewin, Inc., et al., 180 Miss. 626, 178 So. 312. The Construction Company failed to furnish its servant a reasonably safe place to do his work, and the negligence of its foreman in my opinion contributed to the dangerous situation which caused this unfortunate tragedy. The president of the company, who had left the scene a few minutes prior to the accident, should have reasonably anticipated the danger that Wilkie would encounter when he arrived with his load of rock, and also should have required the putting out of "Men at Work" and "Slow" signs, and other danger signals, under all the circumstances, where so many men were working at the abutments of this bridge on the occasion in question. I think that the wife and child of the deceased were entitled to a decree against the Construction Company as well as against the lumber truck operators.

ON SUGGESTION OF ERROR.

**Griffith, J.,** delivered the opinion of the court on suggestion of error.

The suggestion of error challenges the statement of the facts in the controlling opinion in four particulars: (1) As to what was said about the order of the State Highway Commission; (2) as to the statement that the pick-up truck could not have been conveniently parked elsewhere; (3) as to the statement that Wilkie had three negro men to assist him; and (4) as to the statements about the flares and the duty of Wilkie to put them out.

As to the particulars under the first two numerals, without going further into them, we will satisfy those objections, for the purposes of the case, by assuming that it was negligence to park the pick-up truck where it was standing at the time of the injury, and as to the other two we will concede that the argument in the suggestion of error that Wilkie did not have time, with or without assistance, to put out the flares is well taken.

But with the latter concession we still have the obvious situation that had Wilkie, when he arrived at the bridge, stopped his truck on his right-hand side, to the rear of the pick-up truck, and left it there while getting ready to put out the flares, the rapidly approaching truck of Talant would have passed without injury and this, as stated, in the extremely short interval while Wilkie was getting ready to put out the flares.

We have concluded, however, in order to place our decision on clear ground, to eliminate all reference to flares, and to bottom affirmance upon the dominant fact which controlled the chancellor as shown by his opinion, and which was set forth, also, in the main opinion by this court, and that is this: The physical facts demonstrate, and the chancellor found, that when Wilkie realized that the heavy truck of Talant coming from the west, at a high rate of speed, was apparently headed for a col-

lision with the truck of Wilkie, then at right angles across a considerable part of the road, Wilkie ran west upon the bridge for some forty to fifty feet and attempted to flag down the approaching truck of Talant, and as he did so was struck and killed by Talant, so that the proximate cause of the injury and death was the gross negligence of Talant, the driver of the lumber truck, in striking Wilkie in the self-exposed position of the latter, forty or fifty feet away from the parked trucks, a situation wherein ultimately the parked pick-up truck had no causal connection with the injury which occurred forty or fifty feet away and further to the west.

The only way in the stated situation in which it could be said that the pick-up truck had any causal connection with the injury and death would be to hold that it was the position of the pick-up truck on the extreme outer edge of the road, rather than the position of Wilkie's truck, which was at right angle across a large part of the road, which impelled Wilkie to run upon the bridge in front of the approaching truck to flag, but to so hold would require resort to an improbable conjecture, and judicial judgments may not be based upon that process.

Suggestion of error overruled.